EMILIO TORRES, Plaintiff and Appellant, *v.* CELESTINA VÉLEZ DÍAZ ET AL., Defendants and Appellees.

No. 6890. Argued January 23, 1936.—Decided March 27, 1936.

*R. Hernández Matos* for appellant. *José I. Fernández* for appellees.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is an action of debt brought by Emilio Torres against seven minors who were represented by a guardian *ad litem* appointed to that effect by the court.

It is alleged in the complaint that at his commercial establishment located in Ponce, and on different dates, the plaintiff sold groceries in different lots and delivered money in cash, all on open account, to Juan Vélez and his wife Matilde

Ramírez, who died in 1932, and that when the account was liquidated as of June 30, 1933, it showed a balance of $950 in favor of the plaintiff; that the only heirs of the Vélez-Ramírez spouses are their children, the defendants, and that the said balance has not been paid either in whole or in part.

The defendants denied each and every one of the averments of the complaint. The case went to trial, and the defendants admitted that they were the members of the succession of Juan Vélez and Matilde Ramírez, being their sole and universal heirs.

Referring to the Vélez-Ramírez spouses, the plaintiff testified as follows:

"They borrowed money from me, and at the same time, they purchased supplies at the grocery store which I owned; sometimes they made payments to be applied to their account at my store, at other times they made no payments and in that manner the account gradually grew up to a point where it reached the sum of $950 . . . Since the time of their death, their heirs have not been able to pay . . . I have tried to collect from them, but as they are minors, they have told me that they cannot pay me."

And upon the judge asking: "What proof have you of that?" he answered: "The bills. And also the witnesses who lived in the house of the spouses—a lady named Romualda Rodríguez—and the defendants' uncles who have also knowledge of it."

Monserrate Ramírez, a brother of Matilde Ramírez and guardian *ad litem* of the minors, testified regarding the business relations between his deceased sister and the plaintiff. She borrowed money from him to pay interest on a mortgage, taxes, and medicines. To the question put to him by the judge, thus: "Did you not tell Sergio León Lugo, Esq., that you knew that Juan Vélez, your brother-in-law, did not owe a cent to Emilio Torres before his death, that your sister did purchase groceries from him, etc.?" he answered: "It was he who called me and told me to deny in court that he owed money to Emilio Torres so that they could then sell the

property and pay Dr. Casanova, and then give the remainder to him. I told him that I would not do that, that I could not because I knew that he owed that money, and that I did not want to fall out with him nor with the doctor nor with anybody, and that if I was to come to court I would come to tell the truth.''

Romualda Rodríguez testified that she lived with the Vélez-Ramírez spouses for three years; that they purchased groceries and borrowed money at the store of the plaintiff, and it was known to her that the account grew up to $950 ''because he himself gave me the bills and everything; I took them with me when she sent me to bring her money and to purchase for her and everything.''

Thereupon the plaintiff rested and counsel for the defendants stated:

''DEFENDANT: We have no evidence. I have spoken to the uncle of the minors, the guardian *ad litem,* and I have had another interview with the minors, except one of them who is insane, and all of them have told me, have confessed to me, that they really owe that. But I traversed the facts of the complaint, however, in order to hear the evidence that the plaintiff would bring.''

The judge recalled the witness Romualda Rodríguez and asked her some questions, and the following incident occurred:

''JUDGE: If that is all the evidence the court will say that it is not sufficient. Here is a report of Mr. León Lugo, and furthermore, another one of the prosecuting attorney to the effect that this Monserrate Ramírez undertook to assume the defense of the minors and to appoint an attorney and bring an adequate defense in this case, and in spite of all that he now comes to testify in opposition to what Sergio León Lugo, Esq., says that he told him. Things have here been said which ought to be made clear.

''PLAINTIFF: Well, they are here to be explained. As regards what Monserrate Ramírez said, he has already explained.

''JUDGE: The court finds itself without evidence when there is sufficient data before the court to have pleaded a defense in behalf of the interests of these minors.

"DEFENDANT: I caused these minors to appear at my office—the court may hear them—and they have told me that they do owe that money. I have also summoned the guardian *ad litem*. . . .

"JUDGE: But there is not a single book, nor a notebook, nor vouchers, nor anything.

"PLAINTIFF: It seems to us that inasmuch as evidence has been produced which in point of fact has not been attacked nor rebutted, in accordance with our Supreme Court, in the absence of anything else. . . .

"JUDGE: Apart from the fact that the court finds the evidence unworthy of belief.

"PLAINTIFF: If the court wishes to hear more evidence on this. . .

"JUDGE: Yes, at two o'clock in the afternoon and let Mr. León Lugo be summoned to appear then."

During the afternoon session the plaintiff again testified. He identified a notebook wherein there appeared the entries of an account for groceries purchased and cash borrowed by Matilde Ramírez, as well as the part payments made, showing a balance due amounting to $250.86. The notebook was admitted in evidence.

He recognized another notebook containig the separate account of the cash loans, the reason for each transaction being expressed. At the end it contains the following summary:

"Total from the month of expenses (*sic*), 1932 to 1933
    "Total sum of                            $649. 64
    "Account of the store with charge against these    250. 86
    _____
    $900. 50"

The same was admitted in evidence without objection. Later on a great number of receipts for taxes and interest on a mortgage, etc., were admitted, some of them issued in the name of Vélez, and others in that of his widow, Matilde Ramírez.

Attorney Sergio León Lugo then took the stand. His testimony fills twenty-five pages of the record and it is difficult to summarize. He was the attorney for Doña Isabel

González de Casanova, the mortgage creditor of the Vélez-Ramírez spouses; he was in charge of foreclosing, and did foreclose, the credit after the said spouses had died. A guardian *ad litem* was appointed for the minors at his request. He communicated with them personally. "They told me that the plaintiff had sued them. 'And what have you done?' 'Absolutely nothing.' 'Why?' 'Because our uncle does not want to attend to our affairs.' 'But what is the matter?' And they brought me certain notebooks and some documents and showed me that the account was not really that, and then I got in touch with the guardian *ad litem* himself, who had acted as such in the former suit, and went to my office with him, and there he explained to me that really it was nothing of the sort; that a certain amount was owed to him, but not that."

He then devoted himself to the defense of the minors and the court directed the prosecuting attorney to intervene, and the court and the prosecuting attorney commissioned him to make an investigation. "I went there and examined the documents which those girls showed me. The girl over there was the one who took some documents from a small box she had—she showed them to me, and told me that the debt was not true, that according to a notebook which she showed me, there was an account of eighty and odd dollars and another one exceeding seventy and odd dollars which was settled; they told me and explained to me that their mother had money, that they commissioned me to obtain from a colleague certain other documents which they had given him for the purpose of collecting certain accounts, some promissory notes they had, as well as mortgage credits. I did not wish to obtain the same and inquired through another uncle of the girls, whose name I do not recall, and he told me that none of that was true, and that this girl had rented a house to this gentleman about two or three months before her father died, and that as long as her father lived this gentleman paid the rent, but not afterwards, and after the mother

died he had not paid them another cent. If the mother truly took some groceries and all that from him while she lived, however, he owed them a certain amount of money, and in the notebook which they showed me there appeared some amounts due for rent, but they were not complete. I do not recall whether the house was rented for five or six dollars. There appeared two dollars, three dollars. I do not know whether that notebook has turned up. I took a memorandum of it and that is why I said that I had a memorandum of everything. The result of all that examination and investigation which I made, was this report, which I submitted to the court, and I asked it to have the prosecuting attorney investigate the facts carefully, inasmuch as I did not have sufficient authority. In my opinion these children do not owe that amount according to what they showed me that day. There is something else here that I do not know, but I do not know that the amount owed by these children to this gentleman (meaning the plaintiff) is a small one, slightly over eighty dollars, and that such debt is set off in part by the rent of a house of theirs where this gentleman had a store the stock of which did not exceed seventy or eighty dollars for I had the opportunity to make him vacate the place and to see the stock. That is the origin of the report . . .''

The judge intervened as follows:

''JUDGE: You say in this report that the guardian *ad litem* told you. . . .—The words appearing in the report are the ones which the guardian told me in my own office.— . . . That he told you that Juan Vélez owed nothing to Emilio Torres but that it was after his death that Matilde Ramírez purchased groceries from him. I asked him this morning, while he was testifying here, whether he had told you that, and he answered that it was not true, that you were the one who wanted him to come to court to say something different, and that he had refused to do so.—No. In this matter he went to my own office, at my request, to find out about that, not voluntarily— but at my request, so that I could investigate the case in question

pursuant to the order of the court. And the words appearing on this report are the exact words spoken by him in my own office, as they were taken down by me at the very moment that he uttered them."

With regard to the properties left at the death of Mrs. Ramírez, he answered:

"The lot now belongs to Doña Isabel González de Casanova, together with two houses. The other house was not built at the time the mortgage was constituted."

He said that when making the investigation he did not talk to the plaintiff nor to the persons who owed certain sums to the minors according to them, nor was he interested in inquiring about the source of Doña Matilde's income. They told him that she was a quack doctor *(curandera)*, and that she earned a great deal of money, and owned an automobile which the husband of the witness Rodríguez used to drive. The properties he caused to be sold under foreclosure for the collection of five hundred dollars, interest and costs, were not worth over three hundred dollars.

Upon being called back to the witness stand, Monserrate Ramírez, the guardian *ad litem,* answered to questions put by the attorney for the minors as follows:

"Under the same oath which you took this morning, and in relation to this matter and the account which is sought to be collected from these minors, what did you tell me in my office regarding that account? —That it was true, that money was owed to Emilio Torres. —Did I ask you whether you had any particular information, any document, something to bring here to contradict what Emilio Torres said? —. . .—Yes, sir. —What did you answer? —That there was nothing to show the court that the account was truly owed to him. —But I asked you whether there was any witness, any document, so that I might oppose the claim of Emilio Torres, and what did you answer me? —I told you that according to the witnesses, those who are available know that that debt existed indeed; I do not dare to say I did not tell you that.—Did I advise you then to take the minors to my office? —Yes, sir. —Did you take them to me? —I took the girls who are present. —Did you you take them to the office? —Yes. —And what did they say before you?—That it was true."

Upon being examined by the attorney for the plaintiff, he concluded his testimony thus:

"Then Sergio León Lugo called me and told me, 'I shall be the attorney for the mortgage creditor and at the same time I shall defend the girls, and in order to have a greater surplus, we are going to deny the account of Emilio Torres.'—Who told you that?— Mr. León Lugo.—Where?—In his office. And I told him, 'when I walk along the streets of Ponce I want to go peacefully, to walk uprightly, so as not to have enemies;' and he told me, 'don't worry; I'm fearless in court; I fight in court;' and I told him, 'You may fight in court all right, but I'm not going to fight in the street and get killed,' and I told him no, 'because this man is an honest man and I have to pass by his place two or three times every day and I don't want him to become angry and beat me.' I told him that I was coming to court to tell the truth.—And what did you say to the prosecuting attorney in his office before my colleague León Lugo? —I also explained to him what he attempted to do with me.—Who? —Sergio León Lugo.—Was it true that you told my colleague León Lugo that you did not wish to go on defending those girls because they did not obey you?—I told him that I wished to rid myself of those girls because they were in love, and the eldest one could not be found at home in the day time or at night. I say so here in court because you know it is true, and I said that I did not wish to be held responsible for those girls; but I look after the little children because otherwise nobody would feed them."

Angélica Vélez, one of the defendants, testified that, upon being called by her attorney for the purpose of preparing their defense, she informed him that the account claimed was true, that the money was owed to that gentleman, meaning the plaintiff.

The attorney for the defendant testified as follows:

"My name is José I. Fernández Segarra, an attorney practicing in Ponce, having practiced for twenty-one years, unfortunately; and when I agreed to handle this case, which was brought to me by the guardian *ad litem*, I asked him several times to bring me some evidence, any document, any witness, whereon we could base our defense, inasmuch as we had prepared an answer denying the averments of the complaint. He told me that the account was true, that they owed that money, that they had no defense whatsoever. Then I

directed him to take the minors of legal age (*sic*) to me the next day, those who could think for themselves. The next day he brought me this girl who has just testified and a younger one, and I asked them the same question, and they told me that they did owe that account, that their father had opened the same, and afterwards their mother kept it open, and they did the same after her death. I asked them the same question as to whether there was any evidence that might be produced in court in support of their defense and they told me that there was none, that on the contrary—this one told me—that she wanted to come here today and say that that was true. In these circumstances, I told my clients, and above all, the one who brought me the case, the guardian *ad litem,* that our attitude would be to watch the evidence of the plaintiff. If the court is satisfied with my work, good; if it is not, I shall resign and let the court find another attorney who will defend these minors better than myself.''

For a third time the plaintiff took the stand as a witness and upon explaining the meaning of the evidence of the receipts, he said:

''There are receipts for which they had a part of the money and they contributed the same; for examle, where a receipt for twelve dollars was involved, if they had eight dollars, they told me, 'we want four dollars for we have the balance.' ''

And he proceeded to answer the judge as follows:

''JUDGE: But you appear to be presenting the receipt as if it had been paid by you. How much did they pay you on account?—It may appear on the notebook itself.—I have figured out the total, the figures appearing at the end, which makes the account amount to $250.86, that is to say, the one for groceries. There are $649.64 here in cash, according to this. I could not extend my claim to the difference shown there, you see.—And then the total of all these receipts is $1,109.40.—But the reason is that, as I have told you before, there are some receipts where they have contributed a part of the stated amount.''

The evidence was thus closed and the case finally submitted to the court, which decided it by a judgment rendered on July 18, 1934, dismissing the complaint on the merits, without special imposition of costs.

To understand the position assumed by the court, it is necessary to transcribe the statement of the case and the opinion on which its judgment was based. It reads as follows:

"An action of debt is involved, wherein Emilio Torres, the plaintiff, seeks to recover from the defendant the sum of $950 which he alleges is owed to him for money and groceries furnished to the parents of the defendants, now deceased, and subsequently to the defendants themselves, and that when the said current account was liquidated in June 1933, it showed a balance in favor of the plaintiff in the aforementioned sum. All of the defendants are minors, with the exception of one who has not entered an appearance, and at the instance of the plaintiff himself, Monserrate Ramírez was appointed guardian *ad litem,* a position which he accepted, to represent and defend them in this action.

"Notwithstanding this appointment, in accordance with the minutes of this court of March 9, 1934, two of the defendants appeared in open court before the Hon. Judge Domingo Sepúlveda and reported that they were not properly defended by their guardian *ad litem,* and moved that Sergio León Lugo, Esq., be appointed *amicus curiae* in order that he might assist in their defense, to which the court consented, granting them five days to file a written report in regard to the attitude of the guardian *ad litem* in this case. The said report was filed on the 14th of March of this year and a hearing thereon held on the 16th of the same month before Judge Sepúlveda, with the attendance of the parties and the prosecuting attorney. The court ordered that the record be turned over to the prosecuting attorney for an investigation and a written report, which said officer made in the sense that the guardian *ad litem* would continue to represent the defendants and would assume their defense in this case, seeing to the appointment of an attorney immediately.

"Accordingly, the following month José I. Fernández Segarra, Esq., appeared as representing the guardian *ad litem,* and after requesting leave for his clients to litigate in *forma pauperis,* which was granted, he filed an answer denying each and everyone of the facts stated in the complaint.

"After the case was set for trial, the parties and their attorneys appeared, and the plaintiff introduced oral testimony while the defendants offered no evidence; dissatisfied with the way the guardian *ad litem* had testified, notwithstanding the incident which had previously taken place, and inasmuch as minors were involved, the court

órdered Sergio León Lugo to appear as a witness, and he gave full testimony regarding his intervention in this case. Also, at the re-. quest of the court, the plaintiff produced a series of notebooks and receipts which, according to him, justified his claim of $950.00.

"The court, after weighing all the evidence in this case, wishes to state that it gives no credit to the testimony of the plaintiff and of his witnessess; that in accordance with the notebooks, and receipts, and vouchers produced by the former, the amount for which the defendants are indebted to the plaintiff, if any, cannot be definitely ascertained; and that as the attitude of the appointed guardian *ad litem* is very contradictory and suspicious, taking all these facts into consideration, we are of opinion that the plaintiff has not proved the facts alleged in his complaint and that judgment should and is hereby rendered for the defendants, without special imposition of costs."

Feeling aggrieved by that judgment, the plaintiff appealed, assigning as an only error the one committed, as he claims, by the trial court in weighing the evidence. He ends his brief as follows:

"We do not wish to charge the judge of the lower court with having committed an outrage in this case. The said Judge of the District Court of Ponce is one who honors and exalts his profession, and we acknowledge his extraordinary zeal in the administration of justice, but we must say that he is honestly mistaken in attributing importance in this case to evidence which had no merit for making an impression upon him."

In *Blanchero* v. *Heirs of Rosado,* 43 P.R.R. 108, 113, this court said:

" . . . a judge is not bound to believe the testimony of one or more witnesses provided the attendant circumstances compel him conscientiously to give no credence thereto. Of course, he can not act arbitrarily. We have said conscientiously."

We have thought that perhaps we ought to follow in the instant case the course of conduct which we adopted in the *Blanchero* case, for we are convinced that the district judge did not act arbitrarily but conscientiously. However, the opinion we have formed that the judge overstepped his pow-

ers, because a proceeding affecting minors was involved is so strong that we feel ourselves bound to reverse his judgment.

It may be noticed that the judge began the trial impressed by what had taken place before. We mean the investigation made by Attorney León Lugo. And, after a study of the evidence, we conclude that the probatory value given by the judge to the said report is not justified. According to that attorney's own testimony, his conclusions were based on statements of the guardian *ad litem* and of one or more of the defendants, not on any verification of their assertions. And it turns out later that those statements are denied by the very same persons who are said to have made them, and their denial is made in such a way that, in our opinion, rather than be looked upon with suspicion should be regarded as persuasive. We can not find anything reprehensible in the conduct of the guardian *ad litem*. He did what he could, and the truth is that the death of his sister, the widow of Vélez, placed him in a difficult situation and involved him in a series of difficulties which are suggested in the summary of the evidence which we have just made and which appear with greater clearness from a study of the testimony as a whole, as the same appears from the transcript.

Moreover, there is no justification for disregarding the documentary evidence explained by the plaintiff. The fact that when added up the receipts totaled more than the amount claimed, was made clear by the plaintiff. The receipts were not in his name nor were they paid directly by him. He furnished the debtors all or a part of the money they needed to pay their debts off. They constitute evidence of the fact that something imaginary was not involved, that the brief notes in the notebooks explaining the reason for the repeated deliveries of small amounts of money, represented actual transactions.

It appears that close relations existed between the plaintiff and the defendants' predecessors in interest, and that

they lasted until the death of the latter. There existed also business relations which gave rise to the indebtedness. Although their property was small, the predecessors in interest had means to pay. The plaintiff's attitude is perfectly explainable within the dictates of friendship and business. And the attitude of the defendants is also quite clear. If they were convinced of the certainty of the debt, what was the use of denying the same? On the contrary, their duty was to acknowledge and pay it. The evidence tending to create the suspicion that something fictitious might be involved— the testimony of Attorney León Lugo—is destitute of a sound basis, as we have already pointed out, and is not convincing by itself. Apparently the only other existing creditor was Mrs. Casanova, who foreclosed the mortgage which secured her credit. What useful purpose would it serve, then, to simulate the indebtedness to the plaintiff if there were no other creditors to be defrauded by shielding the small house which was seemingly free from responsibility by reason of its having been built after the constitution of the mortgage, unless it be the fact that the interests which Attorney León Lugo represented, were not totally satisfied because the purchase price obtained from the sale of the mortgaged premises at foreclosure was not sufficient to cover the entire credit secured, plus interest and costs?

The judgment should be reversed and another rendered instead sustaining the complaint, without special imposition of costs.

Mr. Justice Travieso took no part in the decision of this case.